UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DEBRA ANN WHELAN,                :
                                 :
        Plaintiff               :      No. 4:10-CV-2244
                                 :
     vs.                         :      (Complaint Filed 11/1/10)
                                 :
MICHAEL ASTRUE,                  :
COMMISSIONER OF SOCIAL           :      (Judge Munley)
SOCIAL SECURITY,                 :
                                 :
        Defendant               :

MEMORANDUM AND ORDER

BACKGROUND

          The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Debra Ann Whelan's claim for social security

disability insurance benefits and supplemental security income

benefits.  For the reasons set forth below we will affirm the

decision of the Commissioner.

          Disability insurance benefits are paid to an individual

if that individual is disabled and "insured," that is, the

individual has worked long enough and paid social security taxes.

The last date that a claimant meets the requirements of being

insured is commonly referred to as the "date last insured."  It

is undisputed that Whelan met the insured status requirements of

the Social Security Act through December 31, 2007. Tr. 11, 13 and

164.[1]  In order to establish entitlement to disability insurance benefits Whelan was required to establish that she suffered from a disability on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Whelan was born in the United States on June 13, 1968. Tr. 28, 67 and 158.  Whelan graduated from high school and can read, write, speak and understand the English language. Tr. 168 and 174.  After high school Whelan completed four years of college and obtained a degree in library science. Tr. 31 and 174. Whelan has past relevant semi-skilled, sedentary employment[2] as a

---

1. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on January 10, 2011.

2. Past relevant employment in the present case means work performed by Whelan during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

shipping clerk. Tr. 30 and 54.  Whelan was employed from January,

1992, until March 31, 2002,  by a federal agency involved with

---

> (a) *Sedentary work*. Sedentary work involves lifting no
> more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and
> small tools.  Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job
> duties.  Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are
> met.
>
> (b) *Light work*.  Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that he or
> she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.
>
> (c) *Medium work*.  Medium work involves lifting no more
> than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds.  If
> someone can do medium work, we determine that he or she
> can do sedentary and light work.
>
> (d) *Heavy work*.  Heavy work involves lifting no more
> than 100 pounds at a time with frequent lifting or
> carrying of objects weighing up to 50 pounds. If
> someone can do heavy work, we determine that he or she
> can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

3

defense finance and accounting. Tr. 161, 169-170, 176 and 202.[3]

Whelan stopped working as a shipping clerk in 2002 when she gave

birth to her first child. Tr. 29-30 and 169.

      Records of the Social Security Administration reveal

that Whelan had earnings from January 1, 1992, through 2002, as

follows:

| | |
|---|---|
| 1992 | $ 15140.00 |
| 1993 | 18750.96 |
| 1994 | 22211.28 |
| 1995 | 25811.63 |
| 1996 | 22254.72 |
| 1997 | 22755.41 |
| 1998 | 23453.74 |
| 1999 | 26053.20 |
| 2000 | 28194.60 |
| 2001 | 15223.42 |
| 2002 | 11424.79 |
| 2003 | 440.00[4] |

Tr. 159.  Whelan has had no earnings or employment since 2003.

      Whelan claims that she became disabled on April 23, 2007,[5]

---

3. Also, from 1994 to 1996, Whelan had part-time work as a stock
person at a clothing store. Tr. 160 and 202.

4. The earnings of $440.00 in 2003 were from unspecified self-
employment. Tr. 202.

5. Whelan in her applications for disability insurance benefits
and supplemental security income benefits alleged that she became
disabled on December 31, 2007.  Tr. 144 and 148.  In a
"Disability Report – Adult" filed with the Social Security
Administration she alleged that she became disabled on December
1, 2006. Tr. 29-30 and 16.  At the administrative hearing held in
this case Whelan amended her alleged disability onset date to
April 23, 2007. Tr. 65.  Whelan has three children and her third
child was born on April 23, 2007. Tr. 62-63.
    Whelan  was 38 years of age on the amended alleged
disability onset date and only 41 years of age at the time of the

4

because of cerebral palsy,[6] degenerative disc disease of the

cervical and lumbar spine, scoliosis,[7] myofascial pain syndrome,

chronic neck and back pain, sleep apnea, hearing loss, and a speech

impediment. Tr. 169; Doc. 9, Plaintiff's Brief, p. 1.

_____

administrative law judge's hearing held on March 16, 2010. Tr.
29.  Whelan is considered a "younger individual" whose age would
not seriously impact her ability to adjust to other work.  20
C.F.R. §§ 404.1563(c) and 416.963(c).

6. The website of the National Institute of Neurological
Disorders and Stroke describes cerebral palsy as

> any one of a number of neurological disorders that
> appear in infancy or early childhood and permanently
> affect the body movement and muscle coordination but
> don't worsen over time.  Even though cerebral palsy
> affects muscle movement, it isn't caused by problems
> in the muscles or nerves. It is caused by abnormalities
> in parts of the brain that control muscle movements.
> The majority of children with cerebral palsy are born
> with it, although it may not be detected until months
> or years later.  The early signs of cerebral palsy
> usually appear before a child reaches 3 years of age.
> The most common are lack of muscle coordination when
> performing voluntary movements (ataxia); stiff or tight
> muscles and exaggerated reflexes (spasticity); walking
> with one foot or leg dragging; walking on the toes, a
> crouched gait, or a "scissored" gait; and muscle tone
> that is either too stiff or too floppy.  A small number
> of children have cerebral palsy as the result of brain
> damage in the first few months or years of life, brain
> infections such as bacterial meningitis or viral
> encephalitis, or head injury from a motor vehicle
> accident, a fall, or child abuse.

NINDS Cerebral Palsy Information Page, http://www.ninds.nih.gov/
disorders/cerebral_palsy/cerebral_palsy.htm (Last accessed
November 11, 2011).

7. Scoliosis is defined as "an appreciable lateral deviation in
the normally straight vertical line of the spine." Dorland's
Illustrated Medical Dictionary, 1497 (27th Ed. 1988).

On October 21, 2008, Whelan filed protectively[8] an
application for disability insurance benefits and an application for
supplemental security income benefits. Tr. 11, 67-68, 144-156 and
164.  On March 25, 2009, the Bureau of Disability Determination[9]
denied Whelan's applications. Tr. 72-94.  On April 15, 2009, Whelan
requested a hearing before an administrative law judge. Tr. 96-97.
Approximately 11 months later, a hearing before an administrative
law judge was held on March 16, 2010. Tr. 24-66.  On July 9, 2010,
the administrative law judge issued a decision denying Whelan's
applications. Tr. 11-20.  On August 6, 2010, Whelan requested that
the Appeals Council review the administrative law judge's decision
and on September 30, 2010, the Appeals Council concluded that there
was no basis upon which to grant Whelan's request for review. Tr. 1-
5.  Thus, the administrative law judge's decision stood as the final
decision of the Commissioner.

On November 1, 2010, Whelan filed a complaint in this
court requesting that we reverse the decision of the Commissioner
denying her social security disability insurance and supplemental

---

8. Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

9. The Bureau of Disability Determination is an agency of the
Commonwealth of Pennsylvania which initially evaluates
applications for disability insurance benefits and supplemental
security income benefits on behalf of the Social Security
Administration.  Tr. 72 and 85.

6

security income benefits.  The Commissioner filed an answer to the
complaint and a copy of the administrative record on January 10,
2011.  Whelan filed her brief on February 22, 2011, and the
Commissioner filed his brief on March 24, 2011.  The appeal[10] became
ripe for disposition on April 5, 2011, when Whelan filed a reply
brief.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary
review of all legal issues decided by the Commissioner.  See Poulos
v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007);
Schaudeck v. Commissioner of Social Sec. Admin.,  181 F.3d 429, 431
(3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir.
1995).  However, our review of the Commissioner's findings of fact
pursuant to 42 U.S.C. § 405(g) is to determine whether those
findings are supported by "substantial evidence." Id.; Brown v.
Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994
F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are
supported by substantial evidence must be upheld. 42 U.S.C. §405(g);
Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the
ALJ's findings of fact are supported by substantial evidence, we are
bound by those findings, even if we would have decided the factual

10. Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."  M.D.Pa. Local Rule 83.40.1.

inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  <u>Brown</u>, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from

8

its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**<u>SEQUENTIAL EVALUATION PROCESS</u>**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the

9

national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[11] (2) has an impairment that is severe or a combination of impairments that is severe,[12] (3) has an

---

[11]. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

[12]. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to

impairment or combination of impairments that meets or equals the requirements of a listed impairment,[13] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[14]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

13. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

14. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Whelan's medical records.

The first medical records that we encounter are from 2005. On December 28, 2005, Whelan had an appointment with Michael Seifert, a certified physician's assistant, at Elco Family Practice,[15] Myerstown, Pennsylvania. Tr. 253.  At that appointment Whelan complained that her hands and feet had been cold for 1 week. Id.  Other than having a temperature of 99.4 degrees, the physical examination revealed no abnormal findings. Id.  Mr. Seifert's assessment was that Whelan was suffering from cold intolerance. Id. Mr. Seifert ordered a complete blood count and thyroid stimulating hormone blood tests. Id.  Mr. Seifert also advised Whelan to increase her iron intake and eat red meat. Id.  The results of the blood tests were completely normal. Tr. 269.

On January 11, 2006, Whelan had a follow-up appointment with Mr. Seifert at Elco Family Practice regarding her complaints of cold intolerance. Tr. 252.  At that appointment Whelan stated that she started taking vitamins and eating more red meat and that she was "feeling better and the symptoms [had] almost resolved." Id. The results of a physical examination of Whelan were normal,

---

15. Elco Family Practice is sometimes referred to as Elco Family Health Center.

including that Whelan's muscle strength was "strong and symmetric with intact deep tendon reflexes, distal pulses." Id.  Mr. Seifert continued Whelan's "current diet, exercise, and medication regime." Id.

On February 16, 2006, Whelan had an appointment at Elco Family Practice complaining of itchy, burning and red eyes. Tr. 251. Whelan was diagnosed with conjunctivitis (pink eye), an inflammation or infection of the membrane lining the eyelid. Id.  Other than the eye problem, blood pressure of 138/98 and a temperature of 100 degrees, the results of a physical examination were normal. Id.  We were unable to decipher the portion of the record relating to the treatment plan.[16]  Furthermore, our review of the administrative record did not reveal a follow-up appointment relating to Whelan's conjunctivitis.

On May 16, 2006, Whelan had an appointment with Joel E. Yeager, M.D., at Elco Family Health Center. Tr. 249-250.  At that appointment Whelan complained of a one month history of hearing loss. Id.  Dr. Yeager did remove some wax (cerumen) from the right external ear canal. Id.  Dr. Yeager did conclude based on the clinical history and audiogram that she suffered a bilateral hearing loss and referred her to an ear, nose and throat specialist. Id.

On June 1, 2006, Whelan had an appointment with Melnick &

---

16. The handwriting is illegible but we suspect that Whelan was prescribed eye drops containing an antibacterial agent.

Moffitt ENT Associates, Lebanon, Pennsylvania. Tr. 330 and 335-336. Whelan was examined by John J. Moffitt, M.D., and also had her hearing tested by an audiologist. Id. Audiological testing revealed that Whelan had mild conductive hearing loss[17] in the ears bilaterally. Tr. 335. Whelan had a speech reception threshold, i.e., the minimum intensity in decibels at which a patient can understand 50% of spoken words, of 25 decibels in the right ear and 35 in the left ear.[18] Id. Dr. Moffitt concluded that Whelan was suffering from otosclerosis, abnormal bone growth in the middle ear causing hearing loss.[19] Tr. 330. Dr. Moffitt told Whelan that she

---

17. Conductive hearing loss occurs when sound is not conducted efficiently through the outer ear canal to the eardrum and the middle ear and usually involves a reduction in sound level or the ability to hear faint sounds. See generally Hearing loss – Overview, Medical Referrence, Encyclopedia, University of Maryland Medical Center, http://www.umm.edu/ency/article/ 003044.htm (Last accessed November 2, 2011).

18. Normal hearing level in decibels is between -10 and 20. Tr. 335. A person who has a hearing threshold in decibels between 0-25 has no significant hearing difficulty. If the level is between 26-40 decibels the person has difficulty with faint or distant speech. Hearing Tests, Results, Health.com, http://www.health.com /health/library/topic/0,,tv8475_tv8482,00.html (Last accessed October 31, 2011).

19. There are three small bones in the middle ear – the malleus, incus and stapes. When these bones become rigid and do not vibrate properly, an individual can suffer conductive hearing loss. The primary bone involved is the stapes (stirrup) which is closest to the inner ear. When there is abnormal growth of bone around the stapes it is unable to move and cannot conduct sound vibrations to the inner ear. Otosclerosis can be treated with medications (Florical) or surgery (stapedectomy). See generally Otosclerosis, Health Sciences, Department of Otolaryngology/Head & Neck Surgery, University of California, Irvine, http:// www.ent.uci.edu/otosclerosis.htm (Last accessed October 31,

had three options: do nothing, obtain a hearing aid or have a stapedectomy (the surgical removal and replacement of the stapes with a prosthetic implant). Id. There was also a discussion of the use of Florical tablets.[20] Id. At the end of the appointment Whelan told Dr. Moffitt she would consider her options. Id.

The next day Whelan notified Dr. Moffitt's office by telephone that she decided to have a stapedectomy. Id. In light of that telephone call, Dr. Moffitt scheduled surgery for June 27, 2006, and on that date Dr. Moffitt successfully performed a stapedectomy. Tr. 330 and 339-340.[21]

On July 7, 2006, Whelan had an appointment with Dr. Moffitt. Tr. 330. Dr. Moffitt's notes of that appointment state in toto as follows: "[Whelan] [f]eels good. She had some dizziness but has passed. Past history and medications reviewed, and changes, if any noted. EXAM: Her ear was debrided. Rinne was positive at 512 and she could hear dial tone. It seems that the prosthesis is working. PLAN: Recommend increasing her activity, avoiding driving or jarring activity. RV: Followup for audio in 4 weeks. Patient

---

2011).

20. Florical is a combination of sodium flouride and calcium carbonate. Florical capsules and tablets, Drugs.com, http://www.drugs.com/drp/florical-capsules-and-tablets.html (Last accessed October 31, 2011).

21. The surgery revealed that the malleus and the incus were movable but that "the stapes was frozen and immobile." Tr. 339. The stapes was removed and a prosthesis implanted. Id.

voices understanding." Id.

On August 14, 2006, Whelan had an appointment with Dr.
Moffitt. Tr. 330.  Dr. Moffitt's notes of that appointment state in
pertinent part as follows: "Debra is doing great. . . She has [a
speech recognition threshold] of 15 [decibels] with 100% [word]
disc[rimination] in her left and she is very happy with the result.
PLAN: I recommended Florical but as she is about to get pregnant, we
are going to hold on that and deal with that at a later time if
necessary. She would like to get the other side done after her
pregnancy.  I stated that is fine but get through the pregnancy
first and followup thereafter.  She is going to then also contact us
when she is ready for her Florical." Id.   The audiologic
examination of August 14, 2006, revealed that the stapedectomy had
resolved Whelan's hearing loss in her left ear. Tr. 333.  Whelan had
normal hearing in her left ear and mild conductive hearing loss in
her right ear. Id.

On September 29, 2006, there was a telephone call between
Whelan's husband and Dr. Moffitt's office regarding whether Mrs.
Whelan should take Florical. Tr. 329.  Dr. Moffitt's office advised
Whelan's husband that his wife should "wait to start the Florical
until after her pregnancy." Id.

The next medical record we encounter is from July, 2007.
On July 2, 2007, Whelan had an appointment with Dr. Moffitt. Tr.
329.  Dr. Moffitt's notes of that appointment state in pertinent

part as follows: "Debra feels her hearing still remains very stable in the left ear and would like to start the Florical.  She is done with pregnancies and would like to preserve her hearing. PLAN: We started her on Florical 1 bid and we are going to stay on it indefinitely. We are going to recheck the hearing in 1 year.  We discussed the stapedectomy in the opposite side which she is interested in but at this point there is no rush. Should we see a decline in the hearing over the next year we may move more quickly." Id.

On August 6, 2007, Whelan had an appointment with Christopher Bustamante, M.D., at Elco Family Health Center. Tr. 246. At that appointment Whelan complained of "fever and flank pain which started about two days ago." Id.  The results of a physical examination were normal except for "mild left flank tenderness." Also, a urine test revealed "some moderate non-hemolyzed blood, positive for nitrates and had trace leukocytes." Id.  Dr. Bustamante's assessment was that Whelan was suffering from a urinary tract infection and started her on the antibiotic Ciprofloxacin. Id. Dr. Bustamante also ordered a CT scan of the abdomen. Id.

A CT scan was performed on August 7, 2007, and revealed that Whelan had three non-obstructing kidney stones (calculi) in the upper, mid and lower poles of the left kidney. Tr. 266.  There was no evidence of swelling of the kidneys or ureters (hydrouretoronephrosis). Id.  Also, on August 7th Whelan had an

17

appointment with Dr. Bustamante. Tr. 244.  Dr. Bustamante's
assessment on that date was that the urinary tract infection
(pyelonephritis) was "resolving" and the plan was to continue the
antibiotic for ten days. Id.

On August 27, 2007, Whelan again had an appointment with
Dr. Bustamante. Tr. 242.  The results of a physical examination on
that date were essentially normal.[22] Id.   Whelan had no
costovertebral angle tenderness.[23] Id.  Dr. Bustamante advised
Whelan to increase her fluid intake for the non-obstructing kidney
stones and also drink cranberry juice to prevent urinary tract
infections. Id.  A blood chemistry taken on August 27, 2007, was
essentially[24] normal. Tr. 265.  A blood chemistry taken on October

---

22. Whelan did have a toenail fungus (ocychomycosis) for which Dr.
Bustamante prescribed Lamisil.

23. The costovertebral angle is the acute angle formed between the
lowest rib and the vertebral column. Pain at this area is usually
attributed to kidney disease. Costovertebral Angle -definition of
costovertebral angle in the Medical Dictionary - by the Free
Online Dictionary, Mosby's Medical Dictionary, 8th Edition, 2009,
http://medical-dictionary.thefreedictionary.com/costovertebral
+angle (Last accessed October 31, 2011).

24. Whelan's total bilirubin was slightly elevated at 1.3 mg/dl
(normal reference range 0.0-1.0 mg/dl) and one of her liver
function enzymes (aspartate aminotransferase(AST)) was slightly
low 13 U/L (normal reference range 15-37 U/L). The reference
ranges can vary from laboratory to laboratory.  High levels of
bilirubin in the blood can cause jaundice. High levels of the
liver function enzymes suggest an inflammatory process or
possible liver damage.  There is no indication on the laboratory
record that Dr. Bustamante had any concern about the total
bilirubin or the liver functional enzyme levels.  See generally,
Bilirubin, WebMD, http://www.webmd.com/digestive-disorders/
bilirubin-15434?page=3 (Last accessed October 31, 2011); Liver

12, 2007, was completely normal. Tr. 264.

On November 2, 2007, Whelan had an appointment at Elco Family Health Center. Tr. 241.  At that appointment Whelan complained of left hip pain. Id.  Blood tests and an x-ray of the hip were ordered.  Tr. 259-263.  The blood tests were completely normal, including Antinuclear Antibody[25] and Rheumatoid factor tests. Id.  The x-ray revealed a possible "subtle dislocation." Tr. 259.  Whelan had a follow-up appointment at Elco Family Practice with Mr. Seifert on November 12, 2007. Tr. 240.  At that appointment Whelan stated that her hip pain had "resolved." Id.  Whelan denied "any other complaints" and was "no longer taking any medications." Id.

On April 22, 2008, Whelan had an appointment with Mahmud Ali, M.D., at Elco Family Health Center. Tr. 238.  At that appointment Whelan complained of "left shoulder pain, tailbone pain and tingling of the right hand and finger[s]." Id.  She also complained of "tiredness." Id.   The results of a physical examination were essentially normal but she did have spasms over the left shoulder and neck and although she had good range of motion, it was with pain. Id.  She also had "point tenderness over the right sacral area." Id.  Dr. Ali's assessment was that Whelan suffered

---

Blood Tests, MedicineNet, http://www.medicinenet.com/liver_blood tests/article.htm. (Last accessed October 31, 2011).

25. A positive ANA test would have been suggestive of an inflammatory process or autoimmune disorder.

from left shoulder pain and right sacral pain which was "most probably secondary to . . . cerebral palsy." Id.  Dr. Ali prescribed the drugs Tramadol[26] and Flexeril.[27] Id.  Furthermore, because of Whelan's complaints of fatigue, Dr. Ali ordered a complete blood count and thyroid function tests. Id.  The results of the blood tests were completely normal. Tr. 258 and 275-276.

On May 27, 2008, Whelan had an appointment with Dr. Ali at Good Samaritan Physician Services.[28] Tr. 236.  At that appointment Whelan complained of back and neck pain but had "[n]o new concerns." Id.  It was noted that Whelan's pain was "relatively controlled" with Tramadol and Flexeril. Id.  Whelan denied chest pain, lightheadedness, palpitations, abdominal pain, bleeding, heartburn, nausea, vomiting, lesions, rash, dizziness, headaches, loss of consciousness, numbness, paresthesia[29] and weakness. Id.  Dr. Ali's

---

26. Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain. Tramadol, Drugs.com, http://www. drugs.com/tramadol.html (Last accessed November 2, 2011).

27. Flexeril is a muscle relaxant. Flexeril, Drugs.com, http://www.drugs.com/flexeril.html (Last accessed November 2, 2011).

28. Good Samaritan Physician Services appears to be a group of doctors associated with The Good Samaritan Hospital, Lebanon, Pennsylvania. Tr. 275 Dr. Ali appears to have been a resident at that hospital because the medical record is signed by Dr. Ali and Daria Kovarikova, M.D., as the attending physician, and there is a notation by Dr. Kovarikova which states "[d]iscussed with resident in detail." Tr. 237.

29. Paresthesia is a sensation of tingling, prickling, or numbness of the skin, more generally known as the feeling of pins and needles. See generally Dorland's Illustrated Medical Dictionary,

physical examination of Whelan revealed that Whelan appeared
healthy, had no signs of acute distress, was oriented to person,
place and time, was cooperative with appropriate behavior; her
respirations were unlabored and lungs were clear to auscultation;
her abdominal exam was normal; she walked with a normal gait; her
upper and lower extremities were normal, including normal strength
and range of motion; and she had full motor strength and reflexes
were brisk and symmetrical.  Id.  "No sensory or motor deficits"
were observed. Id.  Dr. Ali's assessment which was approved by Dr.
Kovarikova was that Whelan suffered from backache unspecified and
cervicalgia (neck pain). Id.  Whelan's prescription for Tramadol and
Flexeril was continued. Id.

On July 2, 2008, Whelan had her yearly appointment with
Dr. Moffitt. Tr. 329.  Dr. Moffitt's notes of that appointment state
in pertinent part as follows: "Really thinks things have remained
very stable over the last year. Has had no ear problems. . . The
ears look fine. Audio and tymp are stable. PLAN: At this point as
things are nice and stable I recommend we just recheck in 12 months.
She is ok with that.  Followup sooner if there are problems.
Patient voices understanding." Id.  Whelan had a speech recognition
threshold of 15 decibels in the left ear and 30 decibels in the
right and a 100% word recognition bilaterally indicating that Whelan
had a mild conductive hearing loss in the left ear and mild to

1232 (27th Ed. 1988).

moderate hearing loss in the right ear.[30] Tr. 331.

On July 19, 2008, Whelan was involved in a "low impact, front damage" motor vehicle collision and was transported to the emergency department at The Reading Hospital and Medical Center by ambulance. Tr. 226-227.  At the scene of the accident Whelan was observed "walking around." Id.   Whelan complained of head pain and some wrist pain but denied loss of consciousness. Id.  At the hospital Whelan was "cooperative, alert and oriented [to person, place and time]." Id.  Whelan appeared in "no acute distress." Id.  A neurological examination revealed that Whelan had strong and equal motor strength in all extremities. Id.  Whelan denied paresthesia, nausea and vomiting. Id.  Whelan had "[n]o facial droop" and her speech was "clear and understandable." Id.  Whelan's Glasgow Coma Scale total was 15.[31] Id.   The verbal portion of the Glasgow Coma

---

30. The individual completing the audiologic examination form (Tr. 331) incorrectly circled at the bottom of the form under impression "conductive," "mild" and "moderate" for the left ear and "conductive" and "mild" for the right ear.  The charts above the impression section of the form clearly indicate that Whelan had a mild conductive hearing loss in the left ear and a mild to moderate conductive hearing loss in the right.

31. The Glasgow Coma Scale is "a quick, practical standardized system for assessing the degree of consciousness in the critically ill and for predicting the duration and ultimate outcome of coma, primarily in patients with head injuries. The system involves eye opening, verbal response, and motor response, all of which are evaluated independently according to a rank order that indicates the level of consciousness and degree of dysfunction. The degree of consciousness is assessed numerically by the best response. The results may be plotted on a graph to provide a visual representation of the improvement, stability, or deterioration of a patient's level of consciousness, which is

Scale was 5 (the highest score possible) signifying that Whelan was oriented and conversing normally.  Whelan was examined by Anthony Palmissano, D.O.  Id.  A CT scan of Whelan's brain and cervical spine and an x-ray of her wrist were ordered.  Id.   The CT scan of the brain revealed "[n]o acute abnormality" but "developmental parietal anomalies" Tr. 229.  The developmental anomalies observed were of the "cortex bilaterally, including right-sided schizencephaly"[32] but

_____

crucial to predicting the eventual outcome of coma. The sum of the numeric values for each parameter can also be used as an overall objective measurement, with 15 indicative of no impairment, 3 compatible with brain death, and 7 usually accepted as a state of coma. The test score can also function as an indicator for certain diagnostic tests or treatments, such as the need for a computed tomography scan, intracranial pressure monitoring, and intubation. The scale has a high degree of consistency even when used by staff with varied experience." Mosby's Medical Dictionary,__, 8th edition, 2009.

32. The National Institute of Neurological Disorders and Stroke's website describes schizencephaly as

> an extremely rare developmental birth defect characterized by abnormal slits, or clefts, in the cerebral hemispheres of the brain.  Babies with clefts in both hemispheres (called bilateral clefts) commonly have developmental delays, delays in speech and language skills, and problems with brain-spinal cord communication.  Individual with clefts in only one hemisphere (called unilateral clefts) are often paralyzed on one side of the body, but may have average to near-average intelligence.  Individuals with schizencephaly may also have an abnormally small head, mental retardation, partial or complete paralysis, or poor muscle tone.  Most will experience seizures. Some individuals may have an excessive accumulation of fluid in the brain called hydrocephalus.

NINDS Schizencephaly Information Page, http://www.ninds.nih.gov/ disorders/schizencephaly/schizencephaly.htm (Last accessed

"unchanged from the prior MRI (May 13, 2004)." Id.  The CT of the cervical spine revealed "[n]o significant abnormality." Id.  The x-ray of Whelan's wrist was normal. Tr. 228.

On August 13, 2008, Whelan had an appointment with Cindy Schmeltz, DNP,[33] at Good Samaritan Physician Services. Tr. 234-235. At that appointment Whelan complained of neck pain but stated that her [b]ack now feels better." Id.   The physical examination of Whelan revealed no signs of acute distress, Whelan was cooperative, and her neck was normal to palpation. Tr. 234.  It further revealed that Whelan walked with a stiff and unsteady gait, decreased range of motion of the cervical spine, pain to left side of neck with movement and muscle tightness in the neck. Id.  Dr. Schmeltz's assessment was that Whelan was suffering from cervicalgia and muscle spasms and she ordered physical therapy and prescribed Skelaxin.[34] Id.

On October 21, 2008, Whelan had an x-ray of the cervical spine which revealed "no acute injury" and "[m]ild degenerative

---

November 1, 2011). At least one study has indicated that schizencephaly is a cause of spastic cerebral palsy. PubMed.gov, Abstract, Schizencephaly as a cause of spastic cerebral palsy, http://www.ncbi.nlm.nih.gov/pubmed/21444273 (Last accessed November 11, 2011).


33. "DNP" is an abbreviation for Doctor of Nursing Practice.

34. Skelaxin is a muscle relaxant. Skelaxin, Drugs.com, http://www.drugs.com/skelaxin.html (Last accessed November 2, 2011).

changes at C6-7." Tr. 256.  On October 31, 2008, Whelan had an MRI
of the cervical spine which revealed scoliosis and "disc bulges,
disc osteophyte complex at C5-C6 and C6-C7 with right neural
foraminal narrowing at C5-C6. Tr. 254.

Between September 28 and December 24, 2008, Whelan had 27
physical therapy sessions at Western Berks Physical Therapy,
Wyomissing, Pennsylvania. Tr. 291-323.  The discharge summary dated
and signed on December 24, 2008, states that Whelan met all physical
therapy goals. Tr. 319.  A physical examination on December 23,
2008, revealed that Whelan's gait, balance and movement were not
impaired. Tr. 320.  The discharge summary further states that
Whelan's communication was not impaired. Tr. 321.

On January 2, 2009, Whelan had an appointment with Craig
H. Johnson, M.D., a neurosurgeon. Tr. 284-288.  Dr. Johnson's
physical examination of Whelan revealed that Whelan had "[n]o
significant paracervical muscle spasm or tenderness" and "[c]ervical
range of motion show[ed] minimal decrease in left lateral rotation."
Tr. 285.  It was noted that Whelan's gait "is slight steppage and
slight spastic gait on the left" and "[t]andem gait [was] performed
reasonably well given her cerebral palsy primarily affecting her
left side." Id.  Whelan was able to toe walk but there was no
ability to heel walk on the left side. Id.  After reviewing the
diagnostic studies, including the MRI of October 31, 2008, and
examining Whelan, Dr. Johnson concluded that Whelan did not have

"any surgically significant abnormality." Id.  Dr. Johnson's
assessment was that Whelan was suffering from cervical degenerative
disc disease at C5-C6 and C6-C7 and cerebral palsy primarily
affecting the left side. Id.  Dr. Johnson prescribed Relafen,[35]
continued her on Skelaxin and Neurontin,[36] and referred her to a
pain specialist. Tr. 286.

       An x-ray of the cervical spine on January 13, 2009,
revealed "mild degenerative disc disease C6-7, and to a lesser
extent C5-6" and "1.5 mm retrolisthesis[37] C3-4 on an extension
view." Tr. 219.

       On January 19, March 23, and March 31, 2009, Whelan had
appointments with Jason T. Bundy, M.D., at Center for Pain Control,
P.C., Wyomissing, Pennsylvania. Tr. 359-366.  At the appointment on
January 19th Whelan admitted "carrying around her young child" and
that "her cerebral palsy never limited her activity." Tr. 364.

---

35. Relafen is a nonsteroidal anti-inflammatory drug used to treat
pain or inflammation caused by arthritis. Relafen, Drugs.com,
http://www.drugs.com/relafen.html (Last accessed November 2,
2011).

36. "Neurontin (gabapentin) is an anti-epileptic medication, also
called an anticonvulsant. It affects chemicals and nerves in the
body that are involved in the cause of seizures and some types of
pain." Neurontin, Drugs.com, http://www.drugs.com/neurontin.html
(Last accessed November 2, 2011).

37. Retrolithesis is a backward (posterior) slippage of one
vertebral body with respect to the one immediately below. See
generally Retrolithesis, http://www.poulinchiro.com/doctor/
chiropractor/chiropractic-Ashburn/id-your-pain/retrolisthesis
(Last accessed November 2, 2011).

Whelan denied any changes in vision or hearing. Tr. 365.  The
physical examination on that date revealed that Whelan had an
abnormal gait and station secondary to her cerebral palsy; she was
able to stand on her toes but had difficulty heel walking on the
left. Id.  It was stated that Whelan had normal (5/5) strength in
the upper and lower extremities with "a mild fade in the left [upper
extremity]." Id.  Whelan had full lumbar range of motion and she was
neurologically intact. Id.  At the appointment on March 31, 2009,
Whelan reported "significant improvement in her neck muscle pain
syndrome with trial application of baclofen[38] and Lidoderm patch."
Tr. 362.  In the report of the March 31st appointment Dr. Bundy
stated that Whelan "has manifestations of mild symptoms of cerebral
palsy, left side predominant." Tr. 359.  Dr. Bundy noted that Whelan
had "no obvious facial droop" and neurologically she was intact. Id.
He stated that she had manifestations of cerebral palsy, i.e., "2+
Ashworth scale spasticity[39] predominantly in the left upper and
lower extremity" but she was "able to ambulate freely." Id.

On March 18, 2009, Jerry Brenner, D.O., reviewed Whelan's

---

38. "Baclofen is a muscle relaxer and an antispastic agent."
Baclofen, Drugs.com, http://www.drugs.com/baclofen.html (Last
accessed November 2, 2011).

39. Spasticity is a measure of muscle tone/tightness. With respect
to cerebral palsy it is where both the arms and legs have
abnormal stiffness.  Those with spastic cerebral palsy have stiff
and jerky movements. About Cerebral Palsy, http://www.about-
cerebral-palsy.org/definition/spastic-cerebral-palsy.html (Last
accessed November 1, 2011). Whelan has spasticity on the left
side but is able to ambulate without significant difficulty.

medical records on behalf of the Bureau of Disability Determination and concluded that Whelan had the ability to engage in sedentary work on a full-time basis. Tr. 341-354.  Dr. Brenner stated that Whelan had no visual, communicative or environmental limitations. Tr. 343-344.

On July 2, 2009, Whelan had an appointment with Dr. Schmeltz at Good Samaritan Physician Services regarding her blood pressure and increasing her dose of Neurontin. Tr. 376-377. At that appointment Whelan denied dizziness, headaches, loss of consciousness, numbness, paresthesia and weakness. Id.  With the exception of her blood pressure, the results of a physical examination were essentially normal. Id.  Dr. Schmeltz'a assessment was that Whelan was suffering from high blood pressure. Id.  She also noted Whelan's history of cerebral palsy. Id.  Dr. Schmeltz increased Whelan's dose of Neurontin and directed Whelan to monitor her blood pressure at home. Id.  The record does not indicate that Dr. Schmeltz prescribed a medication to treat Whelan's high blood pressure. Id.  With regard to Whelan's cerebral palsy, Dr. Schmeltz directed that Whelan follow-up with a "neurosurgeon at [Reading Hospital Medical Center]." Id.

On July 15, 2009, Whelan had an appointment with Dr. Johnson, the neurosurgeon. Tr. 367-368.  After examining Whelan, Dr. Johnson's assessment was substantially the same as his assessment of January 2, 2009. Id.  Dr. Johnson stated as follows: "She has a

28

slight steppage gait and spastic gait on the left. There is no
cervical paravertebral tenderness with palpation.  Cervical range of
motion is slightly decreased in the left lateral rotation. Tandem
gait is performed reasonably well.  Upper and lower extremity
strength is 4+ to 5/5 on the left and 5/5 on the right.  She is
unable to heel walk on the left.  Right heel walking and bilateral
toe walking are performed normally." Id.  Dr. Johnson's impression
was that Whelan was suffering from cervical degenerative disc
disease, slight retrolisthesis at C3-C4 with extension, and cerebral
palsy primarily affecting the left side.  Dr. Johnson further stated
that Whelan was stable neurologically. Id.

On July 16, 2009, Whelan had an appointment with Dr.
Schmeltz at Good Samaritan Physician Services regarding her back
pain and high blood pressure. Tr. 374-375.  At that appointment
Whelan denied having arthralgias, stiffness, swelling, dizziness,
headaches, loss of consciousness, numbness, paresthesia and
weakness. Id.  She further denied having anxiety or mood changes.
Id.  Her blood pressure at that appointment was 140/94. Id.  Other
than the abnormal blood pressure reading, the results of a physical
examination were essentially normal. Id.  Dr. Schmeltz's assessment
was that Whelan was suffering from high blood pressure and Dr.
Schmeltz prescribed Lisinopril for that condition. Id.  Dr. Schmeltz
noted that Whelan's pain syndrome had improved on an increased dose
of Neurontin and that Whelan had seen the neurosurgeon in Reading.

29

Id.

On August 17, 2009, Whelan had an appointment with Dr. Schmeltz regarding her high blood pressure. Tr. 372-373. The results of a physical examination were normal. Id.  Whelan's blood pressure was normal(122/76). Id.  Dr. Schmeltz authorized a refill of Whelan's prescription for Lisinopril. Id.

On or about November 18, 2009, Whelan had an appointment with Steven Katz, D.O., Fairless Hills, Pennsylvania, whose letterhead references a specialty of infectious diseases. Tr. 381. There is only page two of a two page letter from Dr. Katz in the record. The second page of letter indicates that Whelan "has nonrestorative sleep associated with generalized myofascial pain" and Dr. Katz scheduled Whelan for a overnight sleep study.  He also noted that he asked Whelan to reduce her intake of the Neurontin and provided Whelan with samples of Balacet.[40]

On November 23, 2009, Whelan had an appointment with Dr. Schmeltz regarding her high blood pressure. Tr. 370-371.  At that appointment Whelan stated she was taking all medications as prescribed and she was "feeling well overall." Id.  Whelan indicated that she had no frequent headaches or leg swelling and no chest pain

---

40. Balacet is a combination of acetaminophen and propoxyphene. Propoxyphene is a narcotic pain reliever and acetaminophen is a less potent pain reliever and fever reducer that increases the impact of propoxyphene. Balacet, Drugs.com, http://www.drugs. com/mtm/balacet.html (Last accessed November 2, 2011). Balacet was withdrawn from the U.S. market in November, 2010. Id.

or shortness of breath. <u>Id.</u>  Whelan stated she was monitoring her blood pressure at home and she was having normal readings of 110-120/70-80. <u>Id.</u>  Whelan stated she was not exercising other than "chasing after her children." <u>Id.</u>  The results of physical examination were essentially normal. <u>Id.</u>  Whelan's blood pressure was 124/86. <u>Id.</u>  Dr. Schmeltz advised Whelan to increase her exercise and also advised Whelan that she could resume the use of oral contraceptives because her blood pressure was under control. <u>Id.</u>

On January 7, 2010, Whelan had an overnight sleep study at the Good Samaritan Hospital. Tr. 378-379.  The study revealed "the presence of severe obstructive sleep disordered breathing."  Tr. 379.  During her sleep the lowest blood oxygen level was 95%.[41] <u>Id.</u>

The last medical record that we encounter is a letter from Dr. Katz dated January 18, 2010, which states in pertinent part as follows:

> Debra is still complaining of generalized musculoskeletal pain and fatigue.  Her overnight polysomnogram revealed severe sleep disordered breathing and she will be scheduled for CPAP titration test. Extensive laboratory work including rheumatologic studies, Lyme and hepatitis C were all normal.  Debra does seem to be responding to Ultracet p.r.n.[42]  Refill prescription was written for

---

41. Normal blood oxygen saturation ranges from 95% to 100%.

42. "Ultracet contains a combination of tramadol and acetaminophen. Tramadol is a narcotic-like pain reliever. Acetaminophen is a less potent pain reliever that increases the effects of tramadol. Ultracet is used to treat moderate to severe pain."  Ultracet, Drugs.com, http://www.drugs.com/ultracet.html

Ultracet and we await her response to the CPAP treatments. Tr. 380.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Whelan did not engage in substantial gainful work activity since April 23, 2007, the alleged disability onset date. Tr. 13.

At step two of the sequential evaluation process, the administrative law judge found that Whelan had the following severe impairments: cerebral palsy, degenerative disc disease of the cervical and lumbar spine, scoliosis, and myofascial pain syndrome. Id. The administrative law judge concluded that Whelan's hearing loss, sleep apnea, high blood pressure, migraines and history of a kidney infection were non-severe impairments.[43] Tr. 13-15.

At step three of the sequential evaluation process the administrative law judge found that Whelan's impairments did not individually or in combination meet or equal a listed impairment. Tr.

---

(Last accessed November 2, 2011).

43. An impairment is "severe" if it significantly limits an individuals ability to perform basic work activities. 20 C.F.R. § 404.1521;  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id.  An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

15.

At step four of the sequential evaluation process the administrative law judge found that Whelan had "the residual functional capacity to perform sedentary work" with certain limitations. Tr. 15.  Whelan could not operate controls with the left upper or lower extremity; she could only occasionally kneel, stoop, crouch, balance or climb ramps or stairs; she could not engage in any telephone work;  she could only occasionally speak or deal with the public; and she required a sit/stand option at will during the workday. Id.  Based on that residual functional capacity, and Whelan's age, education and work background and the testimony of a vocational expert, the administrative law judge found that Whelan could perform her prior semi-skilled, sedentary work as a shipping clerk.  Consequently, the administrative law judge did not proceed to step five of the sequential evaluation process and found that Whelan was not disabled.

The administrative record in this case is 381 pages in length, primarily consisting of medical and vocational records.  The administrative law judge did an adequate job of reviewing Whelan's vocational history and medical records in her decision. Tr. 13-20.  Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 10, Brief of Defendant.  Whelan's primary argument is that the administrative law judge erred at step three of the sequential

evaluation process by failing to find that Whelan's physical
impairments met the requirements of a listed impairment.  Whelan
also argues that the administrative law judge erred when she found
that Whelan had the residual functional capacity to perform her
prior work as a shipping clerk; that the administrative law judge
erred by inappropriately judging Whelan's credibility; and that the
administrative law judge erred by failing to adequately develop the
record.  We have thoroughly reviewed the record in this case and
find no merit in Whelan's arguments.

        At step two the administrative law judge found that Whelan
suffered from severe impairments.  If Whelan's severe impairments
met or equaled a listed impairment, she would have been considered
disabled per se and awarded disability benefits.  However, a
claimant has the burden of proving that his or her severe impairment
or impairments meet or equal a listed impairment.  Sullivan v.
Zebley, 493 U.S. 521, 530 (1990).  To do this a claimant must show
that all of the criteria for a listing are met.  Id.  An impairment
that meets only some of the criteria for a listed impairment is not
sufficient.  Id.  To qualify for benefits by showing that an
impairment, or combination of impairments, is equivalent to a listed
impairment, Whelan had the burden to present "medical findings equal
in severity to all the criteria for the one most similar listed
impairment." 493 U.S. at 531.  The Social Security regulations
require that an applicant for disability benefits come forward with

34

medical evidence "showing that [the applicant] has an impairment(s) and how severe it is during the time [the applicant] say[s] [he or she is] disabled" and "showing how [the] impairment(s) affects [the applicant's] functioning during the time [the applicant] say[s] [he or she is] disabled."  20 C.F.R. §§ 404.1512(c) and 416.912(c).

Whelan contends she meets Listings 11.07C, 11.07D and 2.09. Listing 11.07 applies to claimants with cerebral palsy who experience significant interference in communication due to speech, hearing, or visual defect (11.07C) or disorganization of motor function as described in 11.04B (11.07D).  Listing 11.04B requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movement, or gait and station (see 11.00C)."  Section 11.00C states in relevant part that "[t]he assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands and arms."  Listing 2.09 relates to those who have a "[l]oss of speech due to any cause, with inability to produce by any means speech that can be heard, understood, or sustained."

Initially it should be stated that no treating physician has provided a functional assessment of Whelan indicating that she is unable to perform her prior work as a shipping clerk for the requisite 12-month statutory period.  Furthermore, no treating physician has indicated that Whelan has significant interference in

35

communication due to speech, hearing, or visual defect or
disorganization of motor function as described in 11.04B and the
bare medical records do not support such a finding.  As for Listing
2.09 there is no basis to conclude that Whelan has a loss of speech
to such a degree that she has the "inability to produce by any means
speech that can be heard, understood, or sustained."

Whelan points to two items of evidence in support of her
contention that she satisfies the listing with respect to loss of
speech.  First, she points to the transcript of the administrative
hearing where portions of the hearing are designated inaudible.
However, it is not unusual to see such "inaudible" designations in
transcripts which are prepared from electronic recordings.
Furthermore, it does not appear from the hearing transcript that the
administrative law judge or counsel ever asked Plaintiff to repeat a
response when the hearing reporter specified an "inaudible" answer
in the typewritten transcript.  Second, Whelan points to a statement
by an employee of the Social Security Administration who interviewed
Whelan on or about November 25, 2008.  That employee stated that
Whelan had a severe speech impediment. Tr. 165-166.  However, that
interview was conducted over the telephone and the administrative
law judge in his residual functional capacity assessment stated that
Whelan could not engage in "any telephone work." Tr. 15.  The
employee of the Social Security Administration did not have an
opportunity to observe Whelan.  In contrast, the medical personnel

who treated and observed Whelan after an motor vehicle accident on July 19, 2008, reported that Whelan's speech was "clear and understandable." Tr. 226.  Furthermore, when Whelan was discharged from physical therapy on December 24, 2008, the discharge summary stated that Whelan's communication was not impaired. Tr. 321.

There is a total lack of medical evidence supporting Whelan's contention that she has a significant speech impediment. If Whelan had such a severe speech impediment, one could expect to see a reference to the speech impediment in the medical treatment notes. However, there are no such references.  In fact, as specified in our review of the medical records, there are reports of Whelan's adequate ability to communicate orally.

The administrative law judge did not err when he found at step three of the sequential evaluation process that Whelan's impairments did not meet or functionally equal a listed impairment.

We are satisfied that the administrative law judge appropriately considered all of Whelan's functional limitations when determining Whelan's residual functional capacity.  As for, Whelan's claim that the administrative law judge failed to adequately develop the record, Whelan was represented by counsel who could have assured that all relevant medical evidence helpful to Plaintiff's claim had been obtained.  Furthermore, Whelan has not proffered any additional evidence, e.g., functional assessments from treating physicians, as part of her present appeal.

37

The administrative law judge appropriately relied on the opinion of Dr. Brenner who concluded that Whelan could engage in sedentary work and that Whelan had no manipulative, visual, communicative or environmental limitations. Tr. 343-344.

Whelan argues that the administrative law judge inappropriately assessed her credibility.  The administrative law judge stated that Whelan's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform her prior sedentary work as a shipping clerk.  Tr. 17.  The administrative law judge was not required to accept Whelan's claims regarding her limitations and her pain. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make).  It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ."  Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility.").  Because the administrative law

judge observed Whelan when she testified at the hearing on March 16, 2010, the administrative law judge is the one best suited to assess the credibility of Whelan.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge


Dated: November 4, 2011

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

DEBRA ANN WHELAN,                    :
                                     :
          Plaintiff                  :    No. 4:10-CV-2244
                                     :
     vs.                             :    (Complaint Filed 11/1/10)
                                     :
MICHAEL ASTRUE,                      :
COMMISSIONER OF SOCIAL               :    (Judge Munley)
SOCIAL SECURITY,                     :
                                     :
          Defendant                  :

<u>ORDER</u>

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1.   The Clerk of Court shall enter judgment in favor of the Commissioner and against Debra Ann Whelan as set forth in the following paragraph.

2.   The decision of the Commissioner of Social Security denying Debra Ann Whelan disability insurance benefits and supplemental security income benefits is affirmed.

3.   The Clerk of Court shall close this case.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge


Dated: November 4, 2011


40